The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. We're ready to proceed, Your Honor. Thank you. Councilwoman Shin-Kaplan, please proceed. Thank you, Your Honor. My name is Sylvia Shin-Kaplan, and I represent the petitioners at And in this instance, the special master in the lower court indicated that Dr. Miller's theory was specific in its identification of the necessary brain vulnerability, its identification of stressors that are relevant to an infant's susceptibility to SIDS, including vaccinations, the effect of cytokines on the body and the periphery, mechanism for how said cytokines arrive at the brain, and the effect of those cytokines in the part of the brain suffering from the defect. She indicated that the theory failed because the increase in cytokine production must directly lead to the failure to arouse in the infant's subsequent death. And she further indicated that Dr. Miller did not tie a transportation mechanism to the cytokines produced locally after vaccinations, and it remained unclear how or why they would arbitrarily find their way across the blood-brain barrier. As this court is well aware, under ALPIN, no direct evidence is required. Direct evidence elevates the petitioner's burden of proof beyond preponderant evidence. The petition, however, did provide circumstantial evidence. Counsel, hasn't this case essentially been decided by this court in the Boakman case that held that the theory that childhood vaccines can cause SIDS is an unsound and unreliable extension of the triple risk model? Your Honor, Boakman is not applicable to this situation because there was additional evidence that was presented in this case that was not present in Boakman. Specifically, there was an article filed by a respondent which indicated that the immediate effect of immunizations are similar to that of a mild infection, and that was present at the appendix on page 459. Further, the petitioners in this case had filed an article, Kashiwagi, which is present at appendix 367, which indicated that cytokines generated after vaccinations are comparable to those cytokines that are generated from patients who are seen on an outpatient basis for mild flu and hospitalized on an inpatient basis for moderate flu. And what they found was that the severity of the symptoms did not increase the severity of the cytokine production. What they did find was that the more vaccinations a person received, the greater the cytokine generation was, but it was not statistically significant. Counsel, that still doesn't answer the question about cytokines crossing the brain blood barrier, does it? I'm sorry, Your Honor. There was evidence presented by both parties that cytokines can pass by active or direct means and indirect means, and Dr. McCusker, respondent expert, did not dispute that. She, in fact, amplified that testimony. She indicated that could be by active transport, by diffusion, by diffusion through the areas where there is no blood-brain barrier. I'm getting at the facts questions here. Cytokines need a normal brain stem? You're right. They don't need a normal brain stem to enter the blood-brain barrier, Your Honor. What they do is they need a normal brain stem to react normally, and that is the crux of the issue here. It's the fact that this child did not have a normal brain stem and because of that was not able to respond to the cytokines that were generated as a result of the immunizations. And the petitioners have presented not only evidence that it can... Well, I'm not sure that answers Judge Lurie's question. Are you saying that they can cross the blood-brain barrier even with an abnormal brain stem? Yes, Your Honor. And where's the evidence in the record to that effect? There is no direct evidence. The indirect circumstantial evidence that exists is that there was testimony by both parties that cytokines can cross the blood-brain barrier. And, Your Honor, there is one area that is not covered by the blood-brain barrier, and that's where the brain stem comes down to join the spinal cord. So that area is not covered by the blood-brain barrier. Therefore, it would be just by diffusion that it could get into the brain compartment and affect... You're saying there's no direct evidence? Correct. And drawing inferences and listening to experts, this is the job of the special master, not this court. Isn't that correct? That is correct, Your Honor. However, the court did not fail to address the entire record. She failed to indicate that there was testimony on this, on how cytokines can cross the blood-brain barrier. Did she have to point to everything in the record to make it clear that she rebuked it? I mean, she did say, having considered the record as a whole and in its entirety, did she not? Yes, she did say that, Your Honor. However, this is undisputed evidence from both parties that it does cross the blood-brain barrier, or it can get into the central nervous system and affect the brain. And the fact that both have presented no evidence would suggest that she did not consider the record as a whole. Counsel, are you saying that since Boatman was decided on background of conflicting experts and so on, as we have here, that the science is advised and there are new kinds of evidence and new analysis that would conceivably distinguish the situation from the time Boatman was decided? Or are you saying just that because we're still talking primarily about unknowns, that it's hard to distinguish the precedent? I am suggesting, Your Honor, and it is, in fact, true, that there is evidence in the current case that was not present in Boatman. Specifically, in Boatman, one of the reasons that entitlement was denied was because the child did not demonstrate the defect that was present as described in the triple risk model. In this instance, the parties both agreed that the child had gliosis of the brainstem, which includes the nucleus. And they both agreed that that defect represented was in accordance with that described by Dr. Kinney. And both parties agreed that the child died of SIDS. Well, to agree you died of SIDS means to agree that you don't know why the child died. Well, we don't have direct evidence, as I said, Your Honor, but we do have circumstantial evidence. And the circumstantial evidence was provided not only by testimony, but also by the human research studies that were discussed at hearing, as well as the animal studies that were discussed at hearing. But the animal studies, the special master found that the animal studies did not actually show what you claim they did based on expert testimony. And the special master has a She doesn't, Your Honor, except for the fact that there was no dispute by the parties, really, that the animal studies then indicated that pro-inflammatory cytokines, such as IL-1 beta, has an inhibitory effect on the serotonergic system. And serotonin is the arousal neurotransmitter. So if it has an inhibitory effect, it prevents serotonin from rising and allowing the infant to wake up. That was not in dispute. What was in dispute was that Dr. McCusker contended that the cytokines remained localized and not short-lived. However, her testimony did not which she also presented. And in Kashiwake, the cytokines were found in the patient's bloodstream 24 to 48 hours after vaccination. And that is certainly not short-lived. But that was from a blood draw, right? That was from a blood draw, Your Honor. However, not necessarily in the brain. Well, Your Honor, once in the blood, it will circulate. It's inevitable. It just happens. The heart rate will propel it forward. It's only when a person ceases, dies, when blood circulation fails. So we know that the cytokines will circulate. We know that it will reach the blood-brain barrier. And there was no dispute that cytokines can cross the blood-brain barrier. And the animal studies indicate that pro-inflammatory cytokines, such as IL-1 data, has an inhibitory effect on the serotonergic system, which is the system that we are currently discussing. So it's the petitioner's opinion that they have met all the outcome problems. And in her case, his case, can be distinguished by the fact that he had the actual defect, which was not present in the Bultmann case. There was, this court had previously indicated... But I'm trying to understand, how does the fact of the defect relate to the validity of the underlying theory? When a child, the child with the defect does not respond as a normal brain would. And as you indicated, a normal brain is necessary for these cytokines to act in the manner in which it is expected to act. So in a child with a defect, it won't respond normally. And that is the crux of the entire triple risk model, is that these children have an intrinsic defect, which will not allow them to arouse when they're placed under an extrinsic stress. And of course, it only occurs during a vulnerable period of life. And that currently is believed to be under six months for SIDS, but the peak is between two and four months. And this child was four months old when he received his immunizations. So his death occurred at the peak of what is now known to be the period of SIDS. Further, Your Honor, in your Boatmine case, you did indicate that since nobody agreed with, or no other physician had indicated that vaccinations could be a cause of SIDS, that theory was unreliable. However, novel theories have been heard in this court before and have been found reliable. Specifically, Alton involved a novel theory. It involved a situation where a tetanus vaccine caused a central nervous system demyelinating disorder, which had never been found in the past. And what this court indicated was that the purpose of the vaccine acts preponderance to allow the finding of causation in a field bereft of complete and and the, but... Please continue. So there is some evidence here, Your Honor, that vaccinations can, are the equivalent of trivial infections. And as I indicated earlier, that part of that evidence was provided by the respondent when they submitted the Veneman article at Appendix 459. And the Veneman article indicated that the immediate effect of immunizations are similar to that of a mild infection. A mild infection has been recognized to be an and that was demonstrated in the Kashiwagi article, which is also not present in the Beaumont decision. Counsel, have you come across any scholarly studies, statistical studies, collections of data as to just the temporal relationship between when the infant receives the vaccines and experiences SIDS? There are no epidemiological studies that, that, I'm sorry, there were epidemiological studies presented at the hearing, but they all had flaws in them. And the flaws were revealed under cross-examination. And even Dr. McCusker, respondent expert, admitted that some of the, that there were flaws in the epidemiology. So there is no epidemiology specifically on point. And part of the problem is that for a decent epidemiological study, one has to have an unvaccinated population. And there is no unvaccinated population to compare to. I, apparently my time is up, especially, your honors. If you would like me to answer any other questions, I would be pleased to do so. Well, we'll save you a little time. Let's hear from the other side. Thank you. Okay. Thank you. All right. Ms. Watts? Yes. Good morning, your honors, and may it please the court. JJ's loss is a tragic loss for this family, but there is no reliable scientific evidence that childhood vaccines can cause sudden infant death syndrome or SIDS. But there's no evidence that it does. I'm thinking about the history of the table injuries, which are in circumstances where it is indeed difficult to tie scientifically the injury to the vaccine, but the circumstances are such that it's at least as likely as not. And isn't that the principle of the table injury? Why shouldn't SIDS also, if the infant experiences SIDS within, let's say, 24, 48 hours? And I think one of the experts put this timeframe on it, that it's at least as likely as not that the vaccine contributed. Isn't that how this science seems to be evolving? No, it's not, your honor. First of all, there's no evidence in this case and in the volume of literature regarding sudden infant death that ties vaccination with SIDS. And comparing this off-table case to an on-table case which respects an opposite. I mean, relying on legislative intent to decrease petitioner's burden of proof in a non-table case would, in the words of this court, conflate the burden of proof imposed for the off-table injuries with a lenient presumption applicable to table injuries, which is impermissible. As you... Well, it's impermissible. I'm trying to understand the public policy. And if we have just a massive public response of avoiding vaccine administration during the first four months, because that's the period of maximum SIDS events, that's contrary to the public policy as well, is it not? I'm not sure I understand your question. I'm really trying to understand. We have these remarkably circumstantial connections of events, and we don't have as yet clear scientific correlation. Although, at least I ask counsel, the science seems to be evolving. We may get to a point where there is a measure of connection between the infant dying within a day or within hours, as we saw in Beaumont, our administration of the vaccine, but trying to get it right, trying to figure out how to apply the public purpose of not discouraging vaccinations because of a very small number. And as I recall, when the Vaccine Act was enacted, it was accepted that a very small percentage, six in my mind, one half of one percent of infants or of people do have an adverse genetic predisposition. And that's unknown, and that's why there's an adverse vaccine response. Whether then you need to prove direct causation or accept it on the table is the next step. But the first step is that when there is, let's call it a genetic flaw in the recipient of the vaccine, that that's why there's an adverse response, not that the vaccine is defective. So, trying to put that together with the occasional case that we see on SIDS, which is not a table injury, is really what's troubling me about these cases. So, as far as you know, is the government, is HHS trying to study and to understand the causes of SIDS? Yes. The medical personnel at HHS follow these cases very closely, and they study immunologic studies very closely as well. It is interesting and significant, however, Your Honor, that even though the risk of SIDS is highest in the two to four-month period, and that is the exact period when infants are receiving their two-month and their four-month vaccines, that despite all those studies, there is no correlation, no causative correlation between vaccines and sudden infant deaths. What we have here... Counselor. Counselor. I'm sorry. Yes, ma'am. Yes, sir. Isn't it also part of your answer that it is not within the purview of this court to administer the table and to add new relationships and diseases and causes to the table? That's correct, Your Honor. That is a function of HHS to add injuries, which, in fact, they have in the past, and they've taken them away as well. Counsel, what is your response to your friend on the other side who says that this case is different from Boatman because there is, in fact, or there's an admitted presence of an abnormal brainstem? Does that make a difference? It makes a difference, but it weakens their case. As Dr. McCusker explained, a cytokine is a messenger molecule. There are different cytokines, and each one has a different function and a different set of cells that are responsive to it and a different timing of release during an immune response. So a cytokine has to bind to the proper receptor for that cell to receive the message and be able to act. As this applies to Dr. Miller's theory, if there's no receptor or if the receptor in the recipient cell is not working, then the message from the cytokine is not received. So she further explained that the upregulation of a specific cytokine can only affect the brain if the corresponding signal transducer is also upregulated and neuronal transmission occurs. With this, she was able to effectively rebut Dr. Miller's theory by explaining the cytokines could not suppress the respiratory response in a brain with a defective 5HP system because the brainstem's receptors are incapable of responding to the cytokines. That is one of the principal foundations of Dr. Miller's theory here. It's a little confusing just because in Bowdoin we said one of the problems with the theory there was that it was a normal brainstem, and here we're saying that now the problem with the theory is that it's an abnormal brainstem. Well, one of the problems with the boat arm case below was that there was an assumption of abnormal brainstem based on statistical information, and there wasn't any direct information in the case for a fact finder to make that finding. That departs from this case. So in Bowdoin, the court never had to address the second issue present here was that even if there were a brainstem defect, does it play a role in supporting Dr. Miller's self-described theory here? So you're correct that Bowdoin didn't directly address this, but the court did address the reliability of Dr. Miller's theory. In that regard, I want to touch briefly upon the assertion that there's new evidence in this case that wasn't in Bowdoin that should somehow undermine the testimony regarding cytokine regulation in this case. As I understand it, Kashiwagi as an article was in the appendix in Bowdoin, but as it reflects this case, it was discussed in the special master's decision at pages 52 and 53. That study, as one of the panel noted, the researchers were measuring serum cytokine in peripheral blood mononuclear cells after stimulation with vaccine components, as well as serum samples from vaccine recipients with and without febrile illness. Dr. McCusker persuasively testified at the hearing that what this article shows is that cytokines, it shows an upregulation of cytokines in the peripheral system, and that's akin to what may happen in the lymph nodes next to the site of vaccination. But it doesn't tell you what's happening in the central nervous system in the brain, and that's the focus of Dr. Miller's theory here. Second, as to the Veneman article, respectfully disagree with my friend. It was discussed in the hearing at appendix 37 and 38, and it does not provide support for Dr. Miller's comparison, analogy between a mild infection and immunization. First of all, the Veneman article doesn't even deal with cytokines, an infection, or vaccination. The term cytokine isn't there at all. Veneman was a meta-analysis of other case-controlled studies that found, and they determined in that study, that reanalysis, that vaccination was associated with actually reducing the risk of SIDS, and they called it author article that was discussed at pages 38 and 39 of the decision, reanalyzed the Veneman data, and while they found that there was no association between vaccination and SIDS, they disagreed with the author's conclusion that there was a protective effect. Council, we have said repeatedly that a petitioner need not establish a specific biological pathway to prove causation. Are you saying that that rule doesn't really apply where there has been so much study of a particular condition like SIDS? No. I guess at its foundation, what I'm saying is, in this case, Dr. Miller himself proffered a very specific theory of causation that depended upon cytokines induced by vaccination entering a very specific part of the brain and damaging the arousal mechanism of an infant with a defective 5-HT system. In evaluating that theory, the special master's observation that the increased cytokine levels in that theory must directly lead to failure to arouse in death, it's simply an indication that Dr. Miller has to support the reliability of his own theory. Well, isn't it fair to say that he's really, with the progress of science and the advances of science, and knowing that he's presenting an opinion on the history of Bultman, which says, whatever it is, you don't even have, I'll call it a prima facie case of connection despite the relationship that he's looking at advances in science to try and understand what happens? I don't know how often SIDS occurs in the infant population, but if it could be better understood, I think there'd be a much larger benefit than the question of that. I'm really trying to focus on what may be different between the state of the science at the time of Bultman and where we are now. There's absolutely no difference in the state of science between the Bultman case and this. There was no new evidence presented. The only difference, of course, in this case, is the evidence of a brainstem defect in JJ. The evidence of that defect actually undermined the proposed theory by Dr. Miller. I mean, ultimately, because his theory fails because it cannot work as articulated, and it wasn't consistent, it is not consistent with what is known about cytokine expression. I mean, even with respect to the Katawagi article that counsel was referring to in her discussion with you, Dr. Miller conceded at the hearing that he could not apply a direct comparison of the findings of that case because the authors didn't detect IL-1 beta in the serotonin in any significant quad disease. And his theory is that IL-1 beta, when it's introduced in a brain with a damaged medulla, can suppress the arousal system. So the theory here is just it's not supported at all. In addition, the special master found that irrespective of the unreliability of this theory, there was no facts, no specific facts in JJ's case that ties the theory to causing his fits under Alpenkron 2. I recognize that I am out of time. I would be happy to respond to any additional questions that panelists have. Any more questions from the panel? No. No, thank you. Okay. All right. Thank you, Ms. Watts. Thank you. Okay, Ms. Chincapa, you have your rebuttal time. Thank you, Your Honor. So two points, Your Honor. There is more evidence in this case than was reflected in the Beaumont decision. Beaumont decision did not reference Katawagi, and it also did not reference the statement by Venneman that vaccinations are analogous to trivial infections. And that was the premise upon which Dr. Mill's testimony proceeded. His testimony was supported by human studies in fits patients that indicated elevated cytokine levels found in the ocular nucleus or the medulla of the brain. And the effect of that was demonstrated by the animal studies, which demonstrated that it shows an inhibitory effect on the serotonergic system. Obviously, we cannot have human data here, because that would involve human experimentation. And we'll have to involve human experimentation in a child who we know has fits, because this doesn't occur in a normal child. What's your answer, though, to counsel's point that where you have an abnormal brainstem, the cytokine can't react with it? Well, that is just an opposite to the triple risk theory. The triple risk theory envisions that a child has a defect, not that a child doesn't have a defect. And it's because of this defect during a vulnerable period of life and the interaction with an environmental trigger that leads to the untimely death. So Dr. McCusker essentially was misstating the theory. And one final point that I would like to make, Your Honor, is when the polio vaccine came on the market many, many years ago, it was a miracle. And over the years, there were fewer and fewer cases of polio. And what happened was they started noticing that the people who were caring for these infants were coming down with polio, which is known as vaccine-associated polio. And because of this, and there was no more than 10 cases a year, but because of this, HHS switched over to the inactivated form of polio vaccine, and there's been no further cases since. Petitioner will concede that this is a rare reaction, but this is the second case that this court has heard within a period of months. And this is not the only two cases. There are this, hopefully this decision by the court would indicate that further study is needed by HHS in this matter. And perhaps a changing schedule would be best, because there's nothing sacred to this vaccine schedule. Vaccine schedules are different throughout the world. So as Judge Newman pointed out- Well, is SIDS on any vaccine schedule? Pardon me? Is SIDS on any vaccine schedule anywhere? Well, when I speak about the vaccine schedule, Your Honor, I'm referring to when the vaccines are administered. And they're administered in the United States at the highest risk period, whereas in other parts of the world, the vaccine schedule itself differs. So there's nothing sacred about the schedule itself. I know that my time is up, and I would be pleased to answer any questions the panel has. But it is petitioners, the appellants believe that they have met the Alton prongs, and they respectfully request that this court reverse the denial of entitlement. Thank you. Any more questions for counsel? No further questions. Judge O'Malley? No, thank you. Okay, thank you. Thank you both. Well argued. The case is taken under submission. That concludes our argued cases for this morning. The Honorable Court is adjourned until tomorrow morning at 10am.